**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **HALA MELIKA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:18-cv-00508** |
| ) | **Judge Campbell / Frensley** |
| **SOCIAL SECURITY ADMINISTRATION,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the

final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance

Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is

currently pending on Plaintiff's "Motion for Judgment on the Record." Docket No. 18. Plaintiff

has filed an accompanying Memorandum. Docket No. 19. Defendant has filed a Response,

arguing that the decision of the Commissioner was supported by substantial evidence and should

be affirmed. Docket No. 20.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for

Judgment on the Record" be DENIED, and that the decision of the Commissioner be

AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed her application for Disability Insurance Benefits ("DIB") on

October 14, 2014, alleging that she had been disabled since May 14, 2013, due to a cerebral

aneurysm. *See, e.g.,* Docket No. 14, Attachment ("TR"), pp. 168-69, 185. Plaintiff's application

was denied both initially (TR 106-08) and upon reconsideration (TR 110-16). Plaintiff

subsequently requested (TR 117-18) and received (TR 40-68) a hearing. Plaintiff's hearing was

conducted on July 20, 2017, by Administrative Law Judge ("ALJ") Michelle Alexander. TR 40.

Plaintiff and vocational expert ("VE"), Catherine Bradford, appeared and testified.[1] TR 40-68.

On October 27, 2017, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR

15-36. Specifically, the ALJ made the following findings of fact:

1.  The claimant meets the insured status requirements of the
    Social Security Act through December 31, 2018.

2.  The claimant has not engaged in substantial gainful activity
    since May 14, 2013, the alleged onset date (20 CFR
    404.1571 *et seq.*).

3.  The claimant has the following severe impairments: morbid
    obesity; right middle cerebral artery aneurysm; and cerebral
    arteriovenous malformation (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination
    of impairments that meets or medically equals the severity
    of one of the listed impairments in 20 CFR Part 404,
    Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
    404.1526).

5.  After careful consideration of the entire record, the
    undersigned finds that the claimant has the residual
    functional capacity to perform sedentary work as defined in
    20 CFR 404.1567(a) except this individual can occasionally
    climb ramps and stairs, never climb ladders, ropes and
    scaffolds; and occasionally balance, stoop, kneel, and
    crouch, but never crawl. This individual also has the
    following additional environmental limitations: must avoid

---

[1] Omar Abed appeared as an Interpreter for Plaintiff. TR 40.

concentrated exposure to extreme cold, extreme heat, and vibration; must avoid ordinary hazards in the workplace such as boxes on the floor and ajar doors; no work with or near dangerous and moving type of equipment or machinery, moving mechanical parts, and unprotected heights; and tolerate moderate noise levels. This individual also has the following additional mental limitations: can understand, remember, and apply simple and routine instructions and tasks; can interact frequently with supervisors, co-workers and the general public; can maintain concentration persistence, and pace for 2 hours at a time over an 8-hour work day; and can adapt to infrequent changes in the work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 19, 1970 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 14, 2013, through the date of this decision (20 CFR 404.1520(g)).

TR 17-31.

On November 1, 2017, Plaintiff timely filed a request for review of the hearing decision. TR 164-67. On April 6, 2018, the Appeals Council issued a letter declining to review the case (TR 1-5), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine: (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been

further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996), *citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389, *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985), *citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnoses and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in

significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process summarized as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments or its equivalent.[2]  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.
>
> (5) The burden then shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*See, e.g.* 20 CFR §§ 404.1520, 416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th

Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

---

[2] The Listing of Impairments is found at 20 CFR § 404, Subpt. P, App. 1.

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  *Moon*, 923 F.2d at 1181; 20 CFR § 404, Subpt. P, App. 2, Rule 200.00(e)(1), (2).  *See also Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 281-82 (6th Cir. 1985).  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

Plaintiff seeks reversal or remand pursuant to sentence 4 of § 405(g), set forth above, arguing that "[t]he ALJ erred when she failed to consider whether her own findings established a "closed period" of disability (i.e., a period of disability with a definite beginning and ending date) despite her rationale that Plaintiff's condition "improved" to the extent of not being disabled." Docket No. 19. Specifically, Plaintiff contends that because the ALJ determined that her condition had "improved" such that her impairments did not last at a disabling level for the requisite minimum twelve month period of disability, the ALJ should have made one residual functional capacity finding concerning Plaintiff's impairments before the "improvement" and a separate residual functional capacity finding concerning Plaintiff's impairments after the "improvement." *Id.* at 10. Plaintiff maintains, "Since the ALJ in this case plainly did not address the issue one way or the other whether Plaintiff's impairments met the minimum required to establish a 12 month period of disability between May 2013 and October 2014 (or May 2015, her last appointment with Dr. Al-Omary her specialist, documented in the record; October 2014 was the last visit, documented in the record with her treating neurosurgeon, Dr. Spooner). If the ALJ wanted to consider denying this claim, even during the timeframe prior to

improvement in her condition, she needed to have a legitimate medical basis for doing so." *Id.* at 11-12. Plaintiff continues, "Assuming, for the sake of argument, that a reasonable ALJ could have questions regarding Plaintiff's impairments or symptoms during this timeframe, she had numerous options at her disposal, *none of which was to engage in lay medical analysis*. For instance, she could have arranged for review of the record and testimony by a medical expert; she could have returned the entire case file (with updated evidence) to the State Agency for review by a medical consultant; ordered a consultative examination to explicitly consider how the improvement in her condition changed her RFC or, perhaps most simply, she could have re-contacted Drs. Al-Omary and Spooner to seek clarification regarding this issue and/or obtain additional information. Unfortunately, she did none of these things." *Id.* at 12, *citing* SSR 12-2p; 20 CFR § 404.1520b(c)(1); HALLEX § I-2-5-34 (italics original).

Plaintiff additionally argues that the ALJ cannot rely on the testimony of a VE to deny benefits at step five when the VE's testimony is based on an inaccurate or legally deficient residual functional capacity finding. *Id.* at 10. Accordingly, Plaintiff argues that the ALJ's decision is not supported by substantial evidence such that remand is required. *Id.* at 12.

Defendant responds that the ALJ properly reviewed the record as a whole and that substantial evidence supports the ALJ's decision that Plaintiff was not disabled because she could perform a restricted range of simple, sedentary work existing in significant numbers in the national economy. Docket No. 20, p. 3-4. Defendant argues that, while Plaintiff suffered a cerebral aneurysm on her alleged onset date, her condition improved over the next several months, and within twelve months of the aneurysm, she retained the ability to perform a range of simple, sedentary work, such that, contrary to Plaintiff's argument, there was no continuous

twelve-month period in which she had a more restrictive residual functional capacity and the ALJ properly determined that Plaintiff was not disabled. *Id.* at 4-5.

Defendant further responds that, despite Plaintiff's contention that the ALJ should have made one residual functional capacity determination for the period prior to Plaintiff's improvement and a separate residual functional capacity determination for the period after Plaintiff's improvement because the ALJ's singular residual functional capacity describes Plaintiff's abilities for the "entire adjudicated period" and assumes that Plaintiff "was limited in exactly the same way during the entire timeframe," that is not what the ALJ's residual functional capacity means. *Id.* at 5. Defendant argues that the ALJ's residual functional capacity determination instead means that Plaintiff did not have any continuous twelve month period in which she had an ability less than that identified by the ALJ in her residual functional capacity determination. *Id.* Defendant asserts, "The Commissioner does not make separate RFC findings every time a claimant has a limitation that lasts less than 12-continuous months. The Commissioner only makes separate RFC findings if the limitations last for at least 12-continuous months. The alternative would require the Commissioner to make a different RFC finding every time a claimant suffers from the flu, or food poisoning, or any other temporary impairment." *Id.*

Defendant argues that Plaintiff's allegation that she had greater limitations than identified by the ALJ for the period between "April 2013" and October 2014 is not supported by the record. *Id.* at 6. Defendant maintains that the ALJ properly evaluated the record, including Plaintiff's treatment records, the medical opinions, and Plaintiff's subjective complaints; properly weighed the evidence, including inconsistencies therein; and properly accepted and incorporated Plaintiff's limitations that were found to be credible and supported by the evidence. *Id.* at 5-10,

12-15.

Addressing Plaintiff's suggestion that the ALJ should have obtained medical expert testimony or re-contacted Plaintiff's treating physicians for a medical opinion regarding the time period between April 2013 and October 2014, Defendant notes that the Commissioner sent several requests for medical opinions to Plaintiff's treating physicians but they "choose [*sic*] not to provide one." *Id.* at 10, *citing* TR 447, 713, 729, 773, 827, 843. Defendant further notes that the Commissioner already has medical expert evidence regarding Plaintiff's impairments during the alleged closed period, and points out that remanding the case to get additional medical expert opinions regarding the same period and same medical evidence would only serve to further delay resolution of Plaintiff's claims. *Id.* at 10-11.

Regarding Plaintiff's assertion that the ALJ made her determination based upon her lay evaluation of the medical evidence, Defendant argues that the Sixth Circuit "has made it clear that the ALJ's RFC finding does not need to correspond to any particular medical opinion" because a residual functional capacity determination is an administrative finding that is reserved to the Commissioner such that requiring the ALJ to base her residual functional capacity determination on a physician's opinion would effectively "confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Id.* at 11, *citing Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App's 395, 401 (6th Cir. 2018); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 311 (6th Cir. 2015).

Addressing Plaintiff's contention that the ALJ improperly relied on the testimony of the VE to deny benefits at step five because the VE's testimony was based on an inaccurate or legally deficient residual functional capacity finding, Defendant responds that the ALJ properly

included all credible and supported limitations into her residual functional capacity and corresponding hypothetical questions such that she could rely upon the VE's testimony that an individual with Plaintiff's limitations could perform work existing in significant number in the national economy and was therefore not disabled. *Id.* at 15-16.

As an initial matter, the reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the ALJ's decision must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389, *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985), *citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980).

In the case at bar, the ALJ ultimately determined that Plaintiff retained the residual functional capacity to perform a restricted range of sedentary work. TR 19-20. Specifically, the ALJ determined that Plaintiff could perform sedentary work that complied with the following additional limitations: occasional climbing of ramps and stairs; never climbing ladders, ropes and scaffolds; occasional balancing, stooping, kneeling, and crouching; never crawling; avoiding concentrated exposure to extreme cold, extreme heat, and vibration; avoiding ordinary hazards in the workplace such as boxes on the floor and ajar doors; avoiding working with or near dangerous and moving type of equipment or machinery, moving mechanical parts, and unprotected heights; and tolerating moderate noise levels. *Id.* The ALJ further found that Plaintiff had the following mental limitations that must be considered in the restricted range of

sedentary work that Plaintiff could perform: understanding, remembering, and applying simple and routine instructions and tasks; interacting frequently with supervisors, co-workers, and the general public; maintaining concentration, persistence, and pace for 2 hours at a time over an 8-hour work day; and adapting to infrequent changes in the work setting. *Id.* In making her residual functional capacity determination, the ALJ considered Plaintiff's medical records and treatment, the medical opinion evidence, Plaintiff's subjective complaints, the hearing testimony, Plaintiff's reported daily activities, and the pre-hearing written submissions. TR 17-32.

Evaluating the medical evidence of record, the ALJ stated:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than those set forth in the above residual functional capacity.
>
> **Right middle cerebral artery aneurysm; and Cerebral arteriovenous malformation.**
>
> On May 15, 2013, the claimant suffered a cerebral aneurism, attributed to arteriovenous brain malformation, resulting in hospitalization and two operative procedures consisting of coiling of her right middle cerebral artery aneurysm and right frontotemporal craniotomy for evacuation of an intercranial hemorrhage, complicated by aspiration pneumonia, which resolved (Exs. 1F, pp. 17-23, 38, 43, 55, 8F, pp. 13-16, 9F, pp. 33-37, 44-48, and 13F, p. 40). Initial computed tomography (CT) scans revealed she had intraparenchymal and diffuse subarachnoid hemorrhage, and mild midline shift, w hile additional pre-operative imaging showed mild increase in size of the frontal lobe parenchymal hemorrhage, new extensive intraventricular hemorrhage, and cerebral aneurysm; but, stable subarachnoid hemorrhage (Exs. 1F, pp. 18-23, 26-28, and 11F, p. 57). Meanwhile, post-operative imaging showed new mild to moderate vasospasm M1 segment right middle cerebral artery and A1 segment of the right cerebral artery; status post coiling cerebral aneurysm; subarachnoid intraventricular hemorrhage decreased in

density since the admission date; and stable right scalp hematoma (Ex. 1F, pp. 32-33, 40, 47-51). According to her discharge summary, she received final diagnoses of subacute nontraumatic subarachnoid hemorrhage, acute respiratory failure, right middle cerebral artery aneurism, seizure, aspiration pneumonia, altered mental status, fever, and vasospasms (Exs. 1F, p. 43, and 2F, p. 125). She was initially prescribed antiepileptic medication and later prescribed opioid pain medication; but, both medication types were discontinued by late 2014 (Ex. 1F, p. 10). Also during this period, she was advised to undergo therapy (pp. 32-33, 38-45), and the claimant's neurologist, John Spooner, M.D., recommended she temporarily refrain from work until August 2013 (Exs. 11E, p. 166, 1F, pp. 63-64, and 2F, p. 141).

The claimant was discharged to Skyline Medical Center-Rehabilitation in stable condition on June 3, 2013, with temporary supervision for certain activities, including eating, grooming, bathing, dressing, and toileting (Ex. 1F, pp. 39, 43-46, 54). While at Skyline, she fell and suffered a slightly displaced comminuted left leg/ankle fracture, which was treated with non-operative gentle closed reduction and a left leg cast (Exc. 1F, p. 55, and 2F, p. 29). The record also shows she complained of headaches around this time and was prescribed medication to take as needed (Ex. 1F, pp. 39-44). The claimant was discharged on July 5, 2013, and according to the post-admission physician evaluation, she was assessed with ADL ambulation dysfunction secondary to intracranial hemorrhage, intraventricular hemorrhage, and aneurysm status post craniotomy (Exs. 1F, pp. 40-41, and 2F, pp. 130-133). Meanwhile imaging of the brain taken in late July 2013 revealed underling encephalomalacia; but, no acute intracranial abnormality, and the record further shows Dr. Spooner continued to recommend that the claimant remain off work and extended her release to October 2013, although he noted at a follow up visit that she had "done very well." (Exs. 11E, p. 169, 1F, pp. 65, 71, and 2F, pp. 138-139, 144).

After her discharge from Skyline, she participated in physical therapy (PT) for ankle/foot pain and difficulty walking (Ex. 2F, p. 27), and PT records document initial complaints of intermittent left foot and ankle pain, swelling, tenderness, and weakness secondary to the broken left ankle (pp. 27-32). Upon initial physical exam, she had reduced range of motion and reduced strength of the ankle/foot (*i.e.* between 2/5 and 3/5), and she was observed

wearing a walking boot (p. 29). But, by late August 2013, she complained less frequently of left ankle stiffness or pain (pp. 41, 49, 53-57) and fatigue (pp. 45, 51-55), and she also reported an "overall decrease in pain/symptoms since the initiation of therapy" with "overall improvement" noted (pp. 33-39, 43-55). Furthermore, according to PT records, she tolerated the treatment well (pp. 33, 37-41, 47-51, 55), generally noted no increase in pain while performing exercises (pp. 33-35, 39, 45, 53-55), and repeatedly reported an overall increase in functional ability (pp. 37-39, 49, 53). Likewise, although she initially had some abnormal exam findings, including limited range of motion with pain and tenderness to palpation of the left ankle (pp. 41-43), the record reflects she was generally "progressing toward achievement of treatment goals as expected." (pp. 35, 39-43, 57, 72, 74).

The claimant also received follow-up treatment with Vartgez K. Mansourian, M.D. in August 2013 (Exs. 2F, pp. 91-92, and 4F, pp. 42-44). According to office treatment records, she walked with a walker and she also had a "wheel chair but not used often", and her husband stated at the office visit that she was not taking any medications (Id.). The claimant reported "gaps in her memory" since the aneurysm, but she also admitted her "memory ha[d] improved" (Id.). Upon exam, her left upper extremities had slightly reduced muscle strength (*i.e.*, 4+5) and she had an antalgic gait; but, she also appeared to be in no apparent distress with normal lumbar range of motion and reflexes; intact sensations, cranial nerves II-XII, and coordination; and no memory deficit (Id.). She also appeared alert and oriented, and had normal speech (Id.).

Likewise, by September 2013, the claimant repeatedly reported during her PT that she had increase in motion, increase in strength, and she was able to walk "without her boot, perform household ambulation, stand to prepare a meal, ascend/descend steps in her home, and sleep through the night." (Ex. 2F, pp. 45, 57). The claimant also stated in September: "No pain right now. It feels good. I didn't want to use the walker today." (Ex. 11E, p. 59). This reported improvement is consistent with largely normal physical exam findings during September 2013, including absent Clonus and Babinski; normal range of motion in all extremities with 5/5 strength; no edema; intact sensations and cranial nerves II-XII; and she appeared alert and oriented to person, place, and time (Ex. 2F, p. 151). Accordingly, she was assessed overall with decreased pain level, increased range of motion, increased strength, improvement

in limited functional activities, and improved balance (p. 57). PT records also show that by September, she partially met some of her treatment goals, including the ability to ambulate without an assistive device without difficulty, safely perform sit to stand transfers, and stair climb without difficulty (p. 58).

In early October 2013, the same month the claimant discharged from PT, she underwent a cerebral arteriogram and a redo of the right frontotemporal craniotomy for clipping of the middle cerebral artery aneurysm resulting in a two-day hospital stay (Exs. 1F, pp. 76-78, 90-91, 2F, pp. 146-153, 3F, pp. 11-16, and 9F, pp. 38-42, 49-53). Post-operative head imaging revealed status post right frontal, partietal anterior, craniotomy for right MCA aneurysm clipping; right frontoparietal extradural fluid collection; extensive encephalomalcia right frontal lobe; and large subgaleal fluid collection along the right frontopaeriatal skull (Ex. 1F, p. 109). According to the discharge summary, she had diagnoses of right middle cerebral artery aneurysm, status post coiling and subarachnoid hemorrhage with intracranial hemorrhage, and status post evacuation of intracranial hemorrhage with right sided craniotomy (Exs. 1F, pp. 90-91, and 3F, p. 11). The record shows she also complained of headaches around this period (Ex. 1F, p. 90). Of note, also during this period, the claimant's medical release was extended by Dr. Spooner through late November 2013 (Exs. 11E, p. 23, 1F, pp. 111-112, and 2F, pp. 10-11). Furthermore, in a separate note, Dr. Spooner opined that although the claimant had done "exceptionally well" since her multiple cranial procedures, she was "obviously disabled" during this period and "unable to work." (Exs. 11E, p. 25, 1F, p. 113, and 2F, p. 12). But, according to physical exam findings from October 2013, the claimant had full range of motion in all extremities with 5/5 muscle strength, grossly intact sensations, and no neurologic abnormalities (ex. 1F, p. 105). Likewise, mental status exams performed in late October 2013 were also normal, and although she had mild fluctuant head swelling upon a subsequent physical exam, her cranial incision was noted to be healing well without redness or drainage (p. 106).

Following the October 2013 clipping operative procedure, the claimant returned to PT and rehabilitation for an additional six weeks, and PT records show she complained of weakness in the bilateral lower extremities, numbness in her left foot and toes, and lumbar pain, which she alleged occurred shortly after she had the brain operation (Ex. 2F, pp. 15-16, 65-66). PT records further show

she was assessed with muscle weakness and difficulty walking based on her reported symptoms and limitations, including difficulty and/or inability with bending, stair climbing, household management tasks, and standing/walking over 10 minutes at a time, as well as initial findings of narrow decreased gait and reduced strength in her lower extremities (*i.e.* between 3/5 and 3+/5)(Id.). But, she also had a normal range of motion of the lower extremities bilaterally with 2+ deep tendon reflexes, and fair balance (Id.).

Of note, by her second PT visit, the claimant admitted she was noncompliant with her home exercise programs, "stating she hasn't done much of anything lately except lie around." (Ex. 2F, p. 70). She also later repeatedly admitted she was only partially compliant with home exercise programs and the record repeatedly reflects she "puts forth little effort while in therapy and will not stay over one hour." (pp. 70, 74-76, 80). Likewise, the record further notes: "Time constraints and slow pacing make it very difficult to progress her." (p. 78). But, despite the foregoing, she reported she "feels better than before treatment", she continued to tolerate treatment well, and she reported feeling "good" or "doing fine" at subsequent sessions (pp. 70-76, 80). Notably, despite putting "forth little effort when working on balance exercises and when strength was assessed" and showing "little to no improvement toward treatment goals secondary to her lack of effort and decreased understanding secondary to language barrier", physical exam findings just prior to her discharge from PT in early December 2013 show improved muscle strength and postural control (pp. 80-83).

Also during this period, the claimant's husband informed Dr. Spooner she had cognitive difficulties including getting around and dressing herself, and Dr. Spooner indicated these would likely be long-term problems related to her history of subarachnoid hemorrhage; but, he also noted that the claimant seemed relatively well and had a nonfocal exam (Exs. 2F, pp. 24-25, and 11E, pp. 38-39). Meanwhile, according to an updated December 2013 CT brain scan, the claimant had stable postinfarction encephalomalacia of the right MCA with ex vacuo dilation of the right lateral ventricle and postoperative dural thickening, and there continued to be no evidence of acute intracranial abnormality (Exs. 2F, p. 21, and 3F, p. 9). Of note, these findings regarding her wellness and nonfocal exam are consistent with treatment records covering the

same period located elsewhere in the record. For example, in early 2014, the claimant received treatment from her primary care physician, Malek H. Al-Omary, M.D., who, according to the office treatment records, she hadn't seen in over a year (exs. 11E, pp. 106-108, 2F, pp. 88-89, 4F, pp. 38-40, and 5F, pp. 46-48). Upon exam, all her joints had normal range of motion with no joint swelling, and she also had grossly intact cranial nerves II-XII; normal gait, motor function and deep tendon reflexes; negative cerebellar signs; and no focal sensory deficit (Id.). She was also alert and oriented to person, place, and time, and had normal insight and judgment (Id.).

Despite the foregoing, Dr. Spooner provided a medical source statement dated February 2014 maintaining that the claimant was still unable to work, and he opined she could not bend, lift, twist, and neither sit nor stand for prolonged periods due to her cerebral aneurysm, subarachnoid hemorrhage, and reported symptoms of brain bleed and headaches (Ex. 9F, pp. 22-24). Dr. Spooner further opined that the claimant would not be able to return to work until mid-May 2014 and she would "possibly" have absences from work due to headache flare-ups; but, he also admitted the probable duration of these conditions were "unknown" (pp. 23-24). Of not, Dr. Spooner subsequently completed an additional medical source statement/restrictions form on behalf of the claimant as part of her long-term disability file with Liberty Mutual, in late February, wherein he indicated she was restricted from bending, driving, and performing strenuous activities between early October 2013 and early October 2014 (Ex. 11E, pp. 11-12).

Also of note, between March and April 2014, Dr. Al-Omary completed his own assessment on behalf of the claimant as part of her long-term disability file, wherein he opined she had poor memory, poor balance, and indicated she could not stand, walk, lift, or drive due to her conditions (Ex. 11E, p. 115). Although the claimant had a normal gait based on examination findings during part of this period (Exs. 11E, pp. 117-118, 4F, pp. 35-37, and 5F, pp. 44-46), she also had positive impaired recent memory (Exs. 2F, p. 97, 4F, p. 34, and 5F, p. 42). She was assessed with late effect of stroke, cerebral aneurysm, and memory deficit (Ex. 2F, pp. 96-97).

Between April and May 2014, the claimant complained of headaches and pain in her back, left shoulder, and left knee and she was assessed with leg swelling, transitional vertebra, back pain,

and edema (Exs. 4F, pp. 25-29, 5F, pp. 35-38, and 11F, p. 47).
Likewise, other than a slow and careful gait, physical exam
findings remained substantially unchanged (*i.e.* normal range of
motion with no joint swelling; grossly intact cranial nerves II-XII;
normal motor function and deep tendon reflexes; negative
cerebellar signs; and no focal sensory deficit) (Id.). She also had a
head CT taken during this period, which noted prior right
craniotomy with similar appearance of right MCA bifurcation
aneurysm and postoperative changes; but, no evidence of acute
intracranial abnormality (Exs. 3F, pp. 6-7, and 9F, pp. 28-29).
Although Dr. Spooner indicated the "head CT looks okay" and
there "does not appear to be any complication", he also
documented the following during this period: "In addition, her
family is pursuing disability for her. I think this is very appropriate
given the fact that she has had a relatively severe intracranial injury
and will always have some cognitive deficits related to this." (Ex.
9F, p. 30).

In July 2014, updated CT imaging of the head showed interval
decrease in size of the small extradural fluid collection below the
craniotomy flap and postoperative changes of the right
frontotemporal craniotomy for cerebral aneurism clipping with
large area of encephalomalacia and mild expected dilation of the
right lateral ventricle (Ex. 9F, p. 58). According to Dr. Spooner,
the "CT scan looks better" and he was "no longer concerned of
hydrocephalus." (P. 59). Also in July, due to the claimant's
concerns about driving, disability, and whether she was able to
work, Dr. Spooner referred her for occupational therapy to evaluate
her ability to operate a motor vehicle safely, and the record
indicates she was orthopedically clear to drive (pp. 56, 59). Of
note, according to the occupational therapy in-clinic assessment,
the primary referring diagnosis was cerebral aneurism, non-
ruptured, and upon referral, her primary complaint was "I get tired
easily when doing housework." (p. 63). The occupational
evaluation assessed the claimant with mild to moderately impaired
memory, and possible impairment in attention, problem solving,
and cognitive flexibility; however, the evaluation expressly noted:
"The patient reported that she is experiencing memory difficulty
with completion of functional cognitive tasks. However the patient
and her daughter reported no other cognitive deficits noted with
completion of life roles. The patient speaks English as a second
language and the language barrier likely effected her performance
on the above cognitive testing and may not be a good predictor of

cognitive function." (pp. 65-67). As part of the occupational evaluation, she also underwent a physical-motor assessment, which resulted in findings of mildly impaired endurance and strength in the upper and lower extremities; but, her coordination, muscle tone, and range of motion for all extremities, in addition to her sensations, balancing, sitting, and standing, were all found to be within functional limits (Id.). Furthermore, in terms of functional mobility, the claimant was found to be independent, and she denied the use of any adaptive equipment (Id.).

On a follow-up with Dr. Spooner in October 2014, he indicated his belief that the claimant was likely disabled secondary to cognitive difficulties (Ex. 9F, p. 69). But, according to physical and neurological exams performed during this period, she had a normal gait, station, and posture; no impairment of recent or remote memory; and she was alert and oriented to person, place, and time (Ex. 14F, pp. 26-27). Meanwhile, during this period through June 2015, the claimant returned to Dr. Al-Omary for treatment of obesity (addressed in morbid obesity discussion below) (Exs. 4F, pp. 6, 9, 21, and 5F, pp. 6, 18-20, 31), diabetes (addressed in paragraph three above (*i.e.* severity discussion)) and back pain, but exam findings remained substantially unchanged (Ex. 5F, p. 11). Likewise, according to subsequent treatment records signed by Dr. Spooner, updated CT brain scans taken in July 2015 showed "no acute change" and he did not recommend any further workup (Ex. 9F, p. 87). For example, imaging showed stable encephalomalacia within the right frontal lobe; mild ex vacuo dilation of the right lateral ventricle; postoperative changes of craniotomy for cerebral aneurysm; and no evidence of acute intracranial process or abnormality (Ex. 9F, pp. 6, 12). This includes no evidence of acute hemorrhage, acute ischemia, extra-axial fluid collections, or hydrocephalus (p. 85).

The claimant also later underwent a psychiatric consultative exam in July 2015 (Ex. 6F), and according to the exam report, she: "was pleasant, but the examiner was unsure if effort in the mental status exam was optimal and whether or not ther may have been minimization of daily activities." (p. 1). The examiner also noted the claimant "did not seem that impaired" when the claimant's son alleged his mother "knows nothing as his father does everything" for her (p. 2). For example, the claimant "had fairly good receptive and expressive English skills" and for the most part, "she could understand, what the examiner was asking her and she responded

in English." (p. 1). The claimant informed the examiner she was unable to work due to bad memory attributed to her aneurism, back pain, and problems with her left leg (p. 2). She also informed the examiner she was a high school graduate, all her schooling was in Egypt, she had lived in the U.S. for almost 16 years, and both her children were in College (Id.). According to the claimant's son, she "did everything prior to the aneurism", but now "she often asks the same question again and again." (Id.). Upon mental status exam, she did not know the specific date, her speech was usually responsive to questions only, she recalled none of the three objects mentioned five minutes previously, and she named the current president, but said she did not know any recent presidents (pp. 2-3). But, the claimant also admitted she uses her phone a lot to keep up with information, watches TV, is on the computer, goes to church, visits her daughter's future mother-in-law, and cooks one day a week although due to back pain she said she cannot do much (Id.). Furthermore, she did not appear to be in psychological distress, and she had average motor activity; organized thought process; suspected good judgment and insight; suspected average intelligence; suspected good ability to relate; neat dress and grooming; good hygiene; and congruent and appropriate mood and affect (Id.). Based on the overall exam, the claimant was found to be no more than moderately limited in her ability to work with the public and adapt; but, her ability to perform complex and detailed tasks, as well as persist and concentrate, was difficult to ascertain based on less than consistent optimal effort on the part of the claimant (p. 4).

Between November 2015 and March 2015, the record shows the claimant reportedly failed the driver's evaluation program (Ex. 9F, pp. 1, 8) despite being orthopedically cleared to drive (p. 91), despite her "impressive recovery" from a grade five subarachnoid hemorrhage (pp. 1, 8), and despite examination findings indicative of improvement. For example, in March 2016, the claimant ambulated well without assistance; appeared awake, alert, and oriented to person, place, time, and situation; moved all extremities in a coordinated fashion; had no obvious cerebellar signs; and had fluent language with appropriate fund of knowledge (exs. 8F, p. 15, 9F, pp. 1, 8, and 10F, p. 8). Similarly, upon a subsequent exam performed in April, her extremities were within normal limits upon inspection with intact sensations, and she appeared alert and oriented with no focal neurologic deficits and thought content within normal limits (Ex. 11F, p. 16).

Lastly, although subsequent exams performed through May 2017 resulted in some abnormal findings, including slow gait, impaired memory, and impaired attention span (Ex. 13F, pp. 8-13, 21-25, 30, 39, 46), additional physical and neurological exams performed during the same period, at Gold Skin Center, consistently found no impairment of memory or attention span (Exs. 12F, pp. 47, 66, and 14F, pp. 2-13, 16-25). Furthermore, the claimant consistently appeared alert and oriented to person, place, and time, as well as had normal gait, station, and posture (Id.).

**Morbid obesity.**

Review of the medical record establishes that the claimant also contends with morbid obesity (Ex. 2F, p. 97), and according to her documented vitals, she maintained a body mass index (BMI) consistently at or above obesity-level throughout the relevant period. For example, in July 2013 she had a BMI of 39.32 with a height of five feet, two inches and body weight of 215 pounds (Ex. 2F, p. 137), and she returned to Dr. Al-Omary between August 2014 and May 2015 for treatment of morbid obesity (Exs. 4F, pp. 6, 9, 21, and 5F, pp. 6, 18-20, 31). She also complained of back pain on occasion, which the medical record indicates worsened after the weight gain (Ex. 4F, p. 23). Lastly, in May 2017, she had a BMI of 52.12 with a body weight of 285 pounds (Ex. 13F, p. 4), which is consistent with her testimony at the hearing regarding her body weight.

This completes review of the medical evidence for the relevant period.

TR 21-27 (emphasis in original).

Of the medical evidence, the ALJ found:

The undersigned finds that the claimant's allegations regarding impaired cognitive function secondary to right middle cerebral artery aneurysm and cerebral arteriovenous malformation, to the extent partly corroborated by the objective medical findings discussed above, and the opinion evidence [to be] discussed below, warrants the mental limitations reflected in the above residual functional capacity. Likewise, the undersigned finds that the claimant's obesity with corresponding back and leg pain, and difficulty standing or walking for a prolonged time, to the extent

partly corroborated by the medical evidence record, and the opinion evidence as discussed below, warrants the exertional and postural limitations reflected in the above residual functional capacity. Furthermore, the undersigned finds the above environmental limitations are warranted to avoid exacerbating the claimant's occasional headaches, and account for her difficulty balancing.

TR 27-28.

Turning to the evaluation of the medical opinion evidence, the ALJ stated:

As for the opinion evidence, in finding the limitations reflected in the above residual functional capacity, the undersigned notes the opinion of the psychological consultative examiner (Ex. 6F), who found the claimant no more than moderately limited in her ability to work with the public and adapt. The undersigned accords this examining source medical opinion great weight because it is consistent with the objective evidence documented through out the medical record, in addition to the noted observations at the hearing held on July 20, 2017, discussed throughout this decision. Whereas, for the reasons identified immediately below, the undersigned gives partial weight to the assessments made by the State agency psychological and medical consultants (Exs. 1A and 4A), who are to be considered and weighed as those of highly qualified physicians and psychologists who are experts in evaluation of the medical and psychological issues in Social Security disability claims (20 CFR 404.1513 and 404.1616). The consultants found the claimant limited to less than a full range of sedentary work activity, with no more than moderate limitations in terms of her understanding and memory, ability to sustain concentration and persistence, and adaptation, which is partially consistent with the totality of the evidence record. However, based upon evidence received at the hearing level, the undersigned finds that the claimant is also moderately limited in her ability to interact with others, and that she can only maintain concentration, persistence, and pace for two hours at a time. Likewise, for these same reasons, the undersigned gives partial weight to the occupational therapy in-clinic assessment, discussed above, which found the claimant had mild to moderately impaired memory, and possible impairment in attention, problem solving, and cognitive flexibility (Ex. 9F, pp. 63-67).

The undersigned also notes various assessments documented throughout the record made by the claimant's treating physicians. Specifically, Dr. Spooner, the claimant's treating neurologist, proffered multiple opinions between October and December 2013 advising that the claimant remain off work until August 2013, subsequently extended to September and then November 2013, at which point he indicated she was disabled and her "anticipated" recovery would be approximately one year from the time of the subarachnoid hemorrhage. (Exs. 11E, pp. 23, 166, 1F, pp. 63-64, 111-113, 2F, pp. 10, 141, and 9F, pp. 22-24). He also indicated it was "likely" the claimants [*sic*] reported cognitive difficulties (*i.e.* ability to dress herself and "get around") would be long-term problems (Ex. 2F, p. 24). Furthermore, in February 2014, he initially opined she could not bend, lift, twist, or sit/stand for a prolonged period and would "possibly" require absences from work due to headaches; and she would not be able to return to work until mid-May 2014 (Ex. 9F, pp. 22-24). Thereafter, in an assessment dated late February 2014, he indicated the claimant had been restricted beginning October 2013 until October 2014, from bending, driving, and performing strenuous activities (Ex. 11E, pp. 11-12), and he later separately noted disability was appropriate for the claimant given she had a relatively severe intracranial injury and would always have some corresponding cognitive deficits (Ex. 9F, p. 30).

Likewise, Dr. Al-Omary, the claimant's primary care provider, also made an assessment on the claimant's behalf, dated March 2014, wherein he opined she could not stand, walk, or lift due to leg problems, and that she also suffered from poor memory, balance, and could not drive (Ex. 11E, p. 115). But, as addressed above, the medical record shows that by August 2014, the claimant repeatedly denied pain or swelling in her legs, exams repeatedly showed she had no joint swelling, and objective imaging showed no evidence of DVT in either leg (Exs. 4F, pp. 26-29, 5F, pp. 35-38, and 11F, p. 47).

TR 28-29.

The ALJ further explained:

As a threshold matter, the undersigned notes statements that a claimant is "disabled", "unable to work", "can or cannot perform a past job", or "meets a Listing", or the like, are not medical

opinions but are administrative findings dispositive of a case, requiring familiarity with the regulations and legal standards set forth therein. Such issues are reserved to the Commissioner of Social Security under 20 CFR 404.1527(d). Thus, a treating physician's opinion, while part of the record and must be considered, is not entitled to controlling weight or special significance insofar as such statements are made.

After thoroughly considering the treating physician rule factors (20 CFR 404.1527(c)(2)) in evaluating the assessments made by the claimant's treating physicians, the undersigned accords little weight to the opinions of Dr. Spooner insofar as such opinions indicate the claimant has cognitive impairments warranting the mental limitations set forth in the above residual functional capacity, because the medical evidence record supports finding that the claimant has moderate mental restrictions. Except for the February 2014 assessments, his opinions were otherwise limited to temporary leave from work or statements that the claimant was disabled. For the reasons described below, the undersigned accords more weight to the February 2014 assessments made by Dr. Spooner, and the March 2014 assessment made by Dr. Al-Omary, insofar as the medical evidence supports finding that the claimant is limited to sedentary exertional work activity with additional postural limitations. However, the undersigned finds that the medical evidence record does not support finding that the claimant can never bend, lift, or twist, or requires absences from work due to headaches.

TR 29.

Addressing Plaintiff's testimony and subjective complaints, the ALJ stated:

According to the testimony of the claimant and the July 2017 attorney-representative pre-hearing brief (Ex. 13E), the claimant weights 295 pounds and alleges disability due to a combination of physical conditions with corresponding physical and mental symptoms or limitations. This includes cognitive dysfunction secondary to aneurism, weekly headaches, back and leg pain, and problems in memory and concentration, as well as reading and writing (Ex. 13E, p. 4; and Testimony). She reportedly takes ibuprofen and Advil for her headaches, and she indicated she lays down the majority of the day and sleeps to alleviate pain (Testimony). The claimant further alleges her impairments limit

her functional ability to stand or walk for longer than five minutes at a time, sit for longer than 30 minutes at a time, lift, bend at the waist, squat, reach, kneel, and stair climb (Ex. 4E, p. 6; and Testimony). She also reports difficulty in completing tasks, understanding, and following instructions (Id.).

Of note, the claimant provided different responses throughout the record regarding her daily living activities during the relevant period, and the record shows inconsistencies regarding her command of the English language. For example, according to the Adult Function Report completed by the claimant's representative in April 2015 (Ex. 4E), the claimant reportedly uses a wheel chair for far distances and a walker and cane for shorter distances, and she reports these two adaptive devices/equipment were initially prescribed in 2012 (p. 7). However, according to the medical record, she denied the use of any adaptive equipment in July 2014, and she was found to have independent functional mobility (Ex. 9F, pp. 65-67). The claimant also alleges she "did not do anything" after her aneurism; however, as previously addressed above, she worked in 2014, albeit not at substantial gainful activity level (Exs. 4D and 5D; and Testimony), as well as occasionally prepared meals, watched TV, attended church, and visited others (Ex. 6F, pp. 2-3). She further alleges that she is illiterate and cannot read or write English. However, this is inconsistent with testimony and the objective evidence. For example, during the hearing it was observed that the claimant was responding to questions posed to her in English sometimes without waiting for the interpreter. Likewise, according to the July 2015 psychological consultative exam report located at Exhibit 6F: "For the most part, she could understand, [*sic*] what the examiner was asking her and she responded in English." (p. 1). The record also shows the claimant has lived in the U.S. for approximately 18 years, and that she has a long work history where she testified she took orders in English (Ex. 6F, p. 2; and Testimony). Furthermore, she held a driver's license in the U.S. at one point and she testified that her daughter did not translate the booklet for her.

TR 20-21.

Of Plaintiff's subjective complaints, the ALJ ultimately determined:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could

26

reasonably be expected to produce the above alleged symptoms;
however, the claimant's statements concerning the intensity,
persistence and limiting effects of these symptoms are not entirely
consistent with the medical evidence and other evidence in the
record for the reasons explained in this decision. Accordingly,
these statements have been found to affect the claimant's ability to
work only to the extent they can reasonably be accepted as
consistent with the objective medical and other evidence.

TR 27.

The ALJ added:

The evidence of record as a whole supports the residual functional
capacity cited above, and it does not contain any unaddressed
contrary findings, other than the claimant's disabling allegations.
However, for the reasons addressed throughout this decision, the
claimant's allegations are not fully consistent with the record.

TR 29.

The ALJ additionally considered Plaintiff's medications and any resultant side-effects,

noting: "there is no evidence of any current adverse medication side effects that would interfere

with the claimant's ability to perform work within the above residual functional capacity." *Id.*

Ultimately, the ALJ summarized the basis of her residual functional capacity

determination as follows:

In sum, the above residual functional capacity assessment is
supported by the preponderance of evidence. The nature and scope
of the claimant's treatment has remained relatively consistent and
conservative since October 2013. It does not reflect an intensity or
frequency of symptom exacerbation as would suggest an inability
to sustain regular and continuous work within the parameters
reflected in the above residual functional capacity. Furthermore,
the limitations adopted herein adequately account for the objective
medical findings documented throughout the record as well as the
limitations reflected in the opinion evidence, as discussed above,
including repeated examination findings of normal range of motion
with no joint swelling (Exs. 2F, pp. 89, 91, 97, 4F, pp. 7, 10, 13,

18, 20, 23, 27, 29, 34, 37, 40, 5F, pp. 8, 11, 16, 19, 21, 24, 28-30, 33, 42-48, 7F, p. 12, 8F, p. 15, 9F, pp. 74-75, and 13F, pp. 8, 12-13, 24-25, 30, 39, 46); grossly intact cranial nerves II-XII; normal motor function and deep tendon reflexes; negative cerebellar signs; and no focal sensory deficit (Exs. 2F, pp. 89, 91, 97, 4F, pp. 7, 10, 13, 18, 20, 23, 27, 29, 34, 37, 40, 5F, pp. 8, 11, 16, 19, 21, 24, 28-30, 33, 42-48, 7F, p. 12, 8F, p. 15, 9F, pp. 74-75, and 13F, pp. 8, 12-13, 24-25, 30, 39, 46); normal insight and judgment (Exs. 2F, pp. 89, 91, 97, 4F, pp. 7, 10, 13, 18, 20, 23, 27, 29, 34, 37, 40, 5F, pp. 8, 11, 16, 19, 21, 24, 28-30, 33, 42-48, 7F, p. 12, 8F, p. 15, 9F, pp. 74-75, and 13F, pp. 8, 12-13, 24-25, 30, 39, 46); alert and oriented to person, place, and time (Exs. 2F, pp. 89, 91, 97, 4F, pp. 7, 10, 13, 18, 20, 23, 27, 29, 34, 37, 40, 5F, pp. 8, 11, 16, 19, 21, 24, 28-30, 33, 42-48, 7F, p. 12, 8F, p. 15, 9F, pp. 74-75, 11F, pp. 3, 9, 16, 26, 32, 36, 43, 12F, p. 47, 13F, pp. 8, 12-13, 24-25, 30, 39, 46, and 14F, pp. 2-13, 16-27); and mixed findings involving positive impaired recent memory (Exs. 4F, pp. 7-13, 18-29, 34-40, 5F, pp. 8-11, 16-24, 28-33, 7F, p. 12, 8F, p. 15, 9F, pp. 74-75, and 13F, pp. 8, 12-13, 24-25, 30, 39, 46); but also later findings of no impairment of recent or remote memory (Exs. 12F, pp. 47, 66, and 14F, pp. 2-13, 16-25). While the undersigned fully sympathizes with the claimant's limiting symptoms, the totality of the evidence record supports a finding that her symptoms are only limiting to the extent reflected in the above residual functional capacity, not disabling.

TR 29-30.

As discussed above, Plaintiff's first point of contention is that the ALJ failed to consider whether her findings established a closed period of disability because she did not render one residual functional capacity determination prior to Plaintiff's improvement and a separate residual functional capacity determination after Plaintiff's improvement. Docket No. 19.

In order to establish an entitlement to benefits (whether via a closed period of disability or disability in general), a claimant bears the burden of proving his/her inability to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which lasted "a continuous period of not less than 12 months." *See* 42 U.S.C.§ 423(d)(1)(A); 20

CFR §§ 404.1594 and 416.994.  This continuous twelve-month durational requirement period

begins at the time a claimant is continuously unable to engage in substantial gainful activity, and

has not engaged in substantial gainful activity, because of a medically determinable impairment.

*See id*; POMS DI 25510.001.  Even if a claimant experiences medical improvement, he/she must

nevertheless meet the continuous twelve-month durational requirement.  *Id.*

As set forth above, after considering the medical and testimonial evidence of record,

including, *inter alia*, Plaintiff's treatment records, the objective medical evidence, the medical

opinion evidence, and Plaintiff's subjective complaints, the ALJ in the case at bar determined

that Plaintiff had failed to establish that she had been unable to engage in any substantial gainful

activity because of a medically determinable physical or mental impairment that lasted for a

continuous period of not less than twelve months, instead finding that Plaintiff retained the

residual functional capacity to perform a limited range of sedentary work with additional

restrictions, and that, even given her limitations, there were jobs that existed in the national

economy that Plaintiff could perform. TR 19-20, 30.  Because the ALJ did not find that Plaintiff

met the continuous twelve-month durational requirement, she was not required to render pre-and

post improvement residual functional capacity determinations, and the ALJ's singular residual

functional capacity determination was proper.

Additionally, with regard to Plaintiff's contention that, in rendering her decision, the ALJ

improperly "engage[d] in lay medical analysis," the ALJ's rationale, quoted above, demonstrates

that she properly evaluated the medical and testimonial evidence of record, reached a reasoned

decision, articulated the basis for her decision, identified inconsistencies in the evidence, and

explained the opinions/evidence she accepted, the weight accorded thereto, and the reasons

29

therefor.  The ALJ's evaluation of the record was proper; her decision was supported by

substantial evidence; and her determination should stand.

Turning to Plaintiff's contention that the ALJ's reliance upon the testimony of the VE to

deny benefits at step five was erroneous because it was "based on an inaccurate or legally

deficient residual functional capacity finding," as discussed above, the ALJ's residual functional

capacity determination was proper.  Moreover, an ALJ may rely on the testimony of a VE in

response to a hypothetical question as substantial evidence of the existence of a significant

number of jobs that the claimant is capable of performing as long as the hypothetical question

accurately represents the claimant's credible limitations.  *See Varley v. Sec'y of Health & Human

Servs.*, 820 F.2d at 779, *quoting O'Banner v. Sec'y of Health, Ed. & Welfare*, 587 F.2d 321, 323

(6th Cir. 1978).  In the instant action, six hypothetical questions were posed to the VE: four by

the ALJ and two by Plaintiff's counsel, each containing varying combinations of limitations.

After hearing the VE's response to all six hypotheticals, the ALJ accepted the VE's testimony

regarding the hypothetical containing the limitations the ALJ ultimately deemed credible,

supported by the evidence, and ultimately accepted.  This is proper.

Because the ALJ properly evaluated the medical and testimonial evidence of record,

proffered appropriate hypothetical questions to the VE, accepted the VE's testimony regarding

Plaintiff's limitations deemed credible, reached a reasoned decision, articulated the basis for her

decision, and her decision was supported by substantial evidence, the ALJ's determination

should stand.

### IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion

for Judgment on the Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

JEFFERY S. FRENSLEY
United States Magistrate Judge